# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| LAND TO SAND SITE SERVICES, INC., | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Civil Action No: |
| | ) |
| HAMPTON ROADS CONNECTOR PARTNERS, | ) |
| DRAGADOS USA, INC., | ) |
| VINCI CONSTRUCTION GRANDS PROJETS, INC., | ) |
| FLATIRON CONSTRUCTORS, INC., | ) |
| DODIN CAMPENON BERNARD INC., | ) |
| PROTECNIUM WORLDING, LLC, | ) |
| RAFAEL RAMIREZ VIZUETE, | ) **JURY TRIAL DEMANDED** |
| BORJA GARCIA JIMENEZ, | ) |
| and JAVIER CORTIJO CORTIJO, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## COMPLAINT

COMES NOW the Plaintiff, Land to Sand Site Services, Inc. ("LTS"), by undersigned counsel, filing this Complaint against the Defendants Hampton Roads Connector Partners ("HRCP"), Dragados USA, Inc. ("Dragados"), Vinci Construction Grands Projets, Inc. ("Vinci"), Flatiron Constructors, Inc. ("Flatiron"), Dodin Campenon Bernard Inc. ("DCB"), Protecnium Worlding, LLC ("Protecnium"), Rafael Ramirez Vizuete ("Ramirez"), Borja Garcia Jimenez ("Garcia"), and Javier Cortijo Cortijo ("Cortijo"). In support thereof LTS alleges upon information and belief as follows:

1.      LTS and its President, Jason Heck ("Heck"), are in the highway construction surveying business, and they are the victims of defendants' confidence game. Luring them in by the promise of a multi-million-dollar long-term contract, the defendants convinced Heck to reveal LTS trade secrets and expertise to other surveyors on the site of the Hampton Roads Bridge-Tunnel

Expansion Project ("the Project").  Agents of the defendants told Heck that the surveyors needed his help, and they represented that the surveyors worked for HRCP, LTS's contract partner.  They told Heck that if he taught the surveyors how to do their jobs and did good work, HRCP would renew and expand LTS's contract.  Indeed, HRCP actually *offered* LTS an expanded contract, only to attempt to void it after LTS had accepted it.  Defendants' empty promises were part of a scheme to separate LTS from its trade secrets and hard-earned expertise without paying for them.

2.      It was only after LTS and Jason Heck divulged the trade secrets that they learned the truth: The surveyors in fact worked for Protecnium, LTS's direct competitor.  The defendants had tricked LTS into telling its competitor its secrets.

3.      These trade secrets have value.  LTS is known in the highway construction industry as *the* company to hire to survey the most difficult highway bridge projects.  They charge a premium for their expertise.  For the last several years, LTS and Jason Heck have been developing a curriculum for a trade school course that will instruct inexperienced company surveyors about how to tackle difficult bridge surveying work.  Here, through deceit, Protecnium surveyors obtained the benefit of LTS's instruction without paying for it.

4.      After LTS and Jason Heck discovered the truth, HRCP unceremoniously cut LTS out of the Project, attempted to void LTS's new contract after it took effect, and awarded the surveying business to LTS's competitor Protecnium.

5.      Defendants achieved this through the work of an insider, defendant Rafael Ramirez.  He was the Project Survey Manager directing LTS and Heck's work on the Project, and he worked for HRCP and for Protecnium at the same time.  Ramirez accessed LTS's confidential bid documents and used his inside knowledge to construct Protecnium's competing bid, ensuring that

Protecnium was just a few dollars cheaper than LTS. That was all defendants needed to cut LTS out once they had misappropriated their trade secrets and expertise.

6.    HRCP wanted the benefit of LTS's trade secrets and expertise. Protecnium wanted the contract for itself. So defendants conspired and lied their way into the deal they wanted. For this they are liable.

## I.    Parties

7.    Plaintiff LTS is a construction surveying company. It is incorporated in North Carolina and has its principal offices at 106 Currituck Sound Drive in Currituck, North Carolina. Steve Heck is Survey Manager for LTS. Jason Heck is President of LTS and is a Senior Party Chief Surveyor.

8.    Defendant HRCP is a joint venture of defendants Dragados, Vinci, Flatiron, and DCB. Its purpose is the building of the Hampton Roads Bridge-Tunnel Expansion Project ("the Project") over the waterway that connects Hampton Roads and Norfolk, Virginia. HRCP has its principal offices at 240 Corporate Blvd in Norfolk, Virginia.

9.    Defendant Dragados is a construction company headquartered in New York. Its principal offices are at 810 Seventh Avenue, 9th Floor in New York, New York. Its registered office in Virginia is at 100 Shockoe Slip, Floor 2 in Richmond, Virginia.

10.    Defendant Vinci is a construction company headquartered in Virginia. Its principal offices are at 2331 Mill Road, Suite 501, in Alexandria, Virginia. Its registered office in Virginia is at 10 S. Jefferson Street, Suite 1400, in Roanoke, Virginia.

11.    Defendant Flatiron is a construction company headquartered in Colorado. Its principal offices are at 385 Interlocken Crescent, Suite 900, in Broomfield, Colorado. Its registered office in Virginia is at 100 Shockoe Slip, Floor 2 in Richmond, Virginia.

12.     Defendant DCB is a construction company headquartered in France.  Its principal office is at 20 Chemin De La Flambere in Toulouse, France.  Its registered office in Virginia is at 10 South Jefferson Street, Suite 1400 in Roanoke, Virginia.

13.     Defendant Protecnium is a Florida Limited Liability Company.  Like LTS, it is in the highway construction surveying business.  Its principal office is at 1000 NW 57th Court, Suite 1040 in Miami, Florida.  Its registered office in Virginia is at 4445 Corporation Lane, Suite 264 in Virginia Beach, Virginia.

14.     Defendant Ramirez is a resident of Virginia.  During all times relevant to this complaint, he was employed as a Survey Manager by defendant Protecnium.  After Protecnium subcontracted with HRCP, Ramirez began working on the Project as the Survey Project Manager.  Despite his employment with Protecnium, at all times relevant to this Complaint, Ramirez held himself out as, and was, an agent of HRCP.

15.     Defendant Garcia is a resident of Virginia.  During all times relevant to this complaint, he was employed as a Survey Party Chief by Protecnium but held himself out as an HRCP employee.

16.     Defendant Cortijo is a resident of Virginia.  During all times relevant to this complaint, he was employed as a Survey Party Chief by Protecnium but held himself out as an HRCP employee.

## II.      Jurisdiction & Venue

17.     This court has federal question jurisdiction under 28 U.S.C. § 1331 over the claim arising under the Sherman Antitrust Act, 15 U.S.C §§ 1 *et seq.*

18.     This court has supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining claims for relief arising under state law because they involve the same facts and the same defendants.

19.     This Court also has subject matter jurisdiction over all state law claims under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and because there is complete diversity between LTS and all defendants.

20.     The Court has personal jurisdiction over the company defendants because they have been and are doing business in the Eastern District of Virginia and they have registered addresses in Virginia.

21.     The Court has personal jurisdiction over Ramirez, Garcia and Cortijo because they reside in Virginia.

22.     Under 28 U.S.C. § 1391(b)(1), venue is proper in the Eastern District of Virginia, Alexandria Division, because all defendants reside in Virginia under § 1391(c), and because defendant Vinci's principal office is in Alexandria, Virginia, and it therefore resides in the Alexandria Division.

### III.    Facts

23.     On April 3, 2019, defendant HRCP, acting through defendants Dragados, Vinci, Flatiron, and DCB, contracted with the Virginia Department of Transportation ("VDOT") to construct the Project ("Prime Contract").  *See* Exhibit 1, Comprehensive Agreement between VDOT and HRCP.

24.     Funding for the Project comes from public funds originating from both the Commonwealth of Virginia and from loans from the federal government.  The total cost of the Project exceeds $ 3 Billion.

25.     VDOT opted to proceed with the Project under the Virginia Public-Private Transportation Act of 1995, Va. Code §§ 33.2-1800 *et seq.* ("VPPTA"), instead of under the Virginia Public Procurement Act, Va. Code §§ 2.2-4300 *et seq.*, because VDOT determined that the VPPTA afforded more "flexibility through an iterative contract development process".  *See* Exhibit 2, I-64 Hampton Roads Bridge-Tunnel Expansion Project, Annual Financial Plan Update, p. 20 (March 31, 2021).

26.     Under the VPPTA, VDOT was obligated to include in the Prime Contract provisions that require HRCP to procure services through only "competitive sealed bidding" or "competitive negotiation" procedures, as those terms are defined in the Virginia Public Procurement Act, Va. Code §§ 2.2-4300 *et seq*.  *See* Va. Code § 33.2-1819, entitled "Procurement", which cites Va. Code § 2.2-4302.1, entitled "Process for competitive sealed bidding", and Va. Code § 2.2-4302.2, entitled "Process for competitive negotiation".

27.     If the Prime Contract requires HRCP to follow the "Process for competitive sealed bidding" under Va. Code § 2.2-4302.1, HRCP would have to issue a written and public Invitation to Bid and would have to award the contract to the lowest responsive and responsible bidder, which includes an analysis not only of cost but also of the "special qualifications of potential contractors", "quality", and "workmanship."

28.     If the Prime Contract requires HRCP to follow the "Process for competitive negotiation" under Va. Code § 2.2-4302.2, HRCP would have to issue a written Request for Proposal, would then have to rank the bidders in order of preference, and would have to negotiate a contract with the bidders proceeding in order of preference.  When ranking the bidders, "[p]rice shall be considered, but need not be the sole or primary determining factor."

29.     Because the Project is funded in part through federal loans, HRCP and VDOT must comply with federal laws and regulations that prohibit collusive and anticompetitive behavior, including 23 U.S.C. § 112, entitled "Letting of contracts", which prohibits any public or private entity working on the Project from "participat[ing] in any collusion, or otherwise tak[ing] any action in restraint of free competitive bidding in connection with such contract."  *See* 23 U.S.C. § 112(c) and (d).  This federal requirement is incorporated in the Prime Contract between VDOT and HRCP and into all subcontracts entered into by HRCP.  *See* Exhibit 3, Prime Contract, Exhibit 26: "FEDERAL REQUIREMENTS FOR FEDERAL-AID CONSTRUCTION PROJECTS, subsection entitled "NON-COLLUSION PROVISION".

30.     In addition, HRCP and VDOT must comply with all federal laws and regulations prohibiting discrimination, including Title VI of the Civil Rights Act of 1964.  This too is incorporated in the Prime Contract and all subcontracts entered into by HRCP.

31.     The Prime Contract requires that HRCP "shall, consistent with applicable state licensing laws and *Good Industry Practice*, provide through qualified, licensed design professionals *employed by* Design-Builder, *or procured from qualified, independent licensed Design Consultants*, the necessary design services, including architectural, engineering, surveying, and other design professional services" necessary to complete the Project.  *See* Exhibit 4, Prime Contract, Exhibit 1: "General Conditions of Contract", Section 2.3.1 (emphasis added).

32.     "Good Industry Practice" is defined in the Prime Contract as "the degree of skill and judgment prevailing on the Agreement Date that is expected to be exercised by prudent, skilled and experienced contractors on similar projects in [the] State[.]"  *See id.* at *8.

33.     In the construction industry, it is "Good Industry Practice" for a prime contractor like HRCP to publish a request for competitive bids from potential subcontractors.

34.    When a prime contractor publishes a request for competitive bids and receives multiple such bids, it is Good Industry Practice for the prime contractor to accept the most competitive such bid.  (This could be, but is not necessarily, the least-costly bid.)

35.    Because this is a public works project through VDOT that uses public funds, HRCP has a duty to, and it is Good Industry Practice to, treat all subcontract bidders fairly and equally.

36.    It is not Good Industry Practice for a prime contractor to share the content of competitive bids with one (but not all) of the competitive bidders.

37.    When a prime contractor shares the content of a competitive bid with another bidder in an attempt to obtain a lower price, this practice is called "bid shopping".  This practice is viewed as unethical and anticompetitive in the construction industry because it undermines the integrity of the competitive bidding process, distorts the market for services, and ultimately reduces construction quality.

38.    "Bid shopping" has been publicly condemned by many trade entities including the Associated General Contractors of America and The American Subcontractors Association.

39.    Over the last decade, Congress has considered prohibiting "bid shopping" related to federal contracts, including in the Stop Unfair Bid Shopping Act of 2019.

40.    The "competitive sealed bidding" and "competitive negotiation" procedures that are required by Virginia law to be incorporated in the Prime Contract are inconsistent with "bid shopping".  *See* Va. Code § 33.2-1819, citing Va. Code §§ 2.2-4302.1 and 2.2-4302.2.

41.    "Bid shopping" is also inconsistent with Va. Code § 33.2-1820 (E), which provides that "[c]ost estimates relating to a proposed procurement transaction . . . shall not be open to public inspection."

42. When a prime contractor favors one bidder over another and provides the favored bidder with exclusive access to other bidder's bid information and price schedule in order to rig the bidding in favor of that bidder, this "bid rigging" is an unreasonable restraint of trade.

43. Both "bid shopping" and "bid rigging" are not Good Industry Practice. They are also inconsistent with the "competitive sealed bidding" and "competitive negotiation" procedures set forth in Va. Code §§ 2.2-4302.1 and 2.2-4302.2, which are required by law to be incorporated in the Prime Contract.

44. It is not Good Industry Practice for a prime contractor to allow an employee of a subcontractor with a conflict of interest to prepare comparison tables and to evaluate competitive bids involving that subcontractor's proposals. This is also inconsistent with the "competitive sealed bidding" and "competitive negotiation" procedures set forth in Va. Code §§ 2.2-4302.1 and 2.2-4302.2, which are required by law to be incorporated in the Prime Contract.

45. It is not Good Industry Practice for a prime contractor to offer a contract to a subcontractor and then, after it is signed by the subcontractor, to attempt to void it without explanation.

46. It is not Good Industry Practice to hire a subcontractor to a limited term subcontract in order to steal their trade secrets and methods and to provide such trade secrets and methods to another subcontractor who offers to work at a lower price. This is also inconsistent with the "competitive sealed bidding" and "competitive negotiation" procedures set forth in Va. Code §§ 2.2-4302.1 and 2.2-4302.2, which are required by law to be incorporated in the Prime Contract.

47. Consistent with Good Industry Practice, the Prime Contract allows HRCP to prepare plans and proposals "for a portion of the Work to permit procurement and construction to

proceed on that portion of the Work".   *See* Exhibit 4, Prime Contract, Exhibit 1: "General Conditions of Contract", Section 2.4.5.

48.    LTS is an "independent licensed Design Consultant" under the terms of the Prime Contract.

49.    In 2019, Steve Heck of LTS interviewed for a position with Dragados.  The person who interviewed Steve Heck for the Dragados position was Ramirez, who held himself out as a Dragados employee.  On that basis Steve Heck, Jason Heck, and LTS reasonably believed that Ramirez worked for Dragados.

50.    In 2019, LTS was involved in a joint venture agreement with Hayden Frye and Associates, Inc. ("Hayden Frye"), another surveying company.  The goal of the joint venture was to land all of the survey work on the Project.

51.    Hayden Frye entered into a subconsulting agreement with HRCP on May 29, 2019.  This subcontract was an initial agreement for limited services not to exceed $35,000 in value.  Hayden Frye and its partner LTS reasonably believed that this subcontract was a first step in reaching agreement on a contract for all of the survey work on the Project.

52.    During negotiations for the entire survey contract in the summer of 2019, John Kuchem ("Kuchem"), Assistant Director of Survey and Construction Surveys Estimator for Hayden Frye, met with defendant Ramirez.  Ramirez told Kuchem that he worked for Dragados and talked about the numerous Dragados projects that he had worked on.  After meeting with Ramirez, Kuchem told Jason Heck about his meeting with Ramirez, including Ramirez's claimed affiliation with Dragados.  Based on these representations from Ramirez via Kuchem, Jason Heck and LTS reasonably believed that Ramirez worked for Dragados and HRCP.

53.    Hayden Frye submitted a detailed proposal to HRCP and met with HRCP management and Ramirez multiple times.  But the parties did not reach an agreement for all the survey work.

54.    After talks concluded, Ramirez told Hayden Frye that the HRCP management had decided not to outsource the survey work on the Project.  Hayden Frye communicated this to Jason Heck of LTS.

55.    On August 9, 2019, shortly after negotiations with Hayden Frye reached a dead end, defendant Protecnium entered into a subcontract with defendant HRCP ("Protecnium Subcontract").  Among other things, the Protecnium Subcontract paid Protecnium to furnish a Project Survey Manager and a Senior Marine Surveyor.   Protecnium and HRCP would later modify the Protecnium Subcontract by numerous Change Orders and contract amendments which brought additional Protecnium surveyors onto the Project.  Collectively, this subcontract has paid Protecnium over five (5) million dollars.

56.    Notwithstanding the above-referenced subcontract, neither Jason Heck nor LTS were made aware of the Protecnium Subcontract prior to LTS's own subcontract with HRCP in 2022.  To the contrary, based on Ramirez's representations in 2019 to Kuchem, Jason Heck and LTS reasonably believed that the HRCP partners were performing the survey work themselves.

57.    In the Protecnium Subcontract, Protecnium expressly warrants that "neither [Protecnium], nor any of his, her or its employees, shall be an employee of HRCP for federal and state tax purposes or for any other purpose.  It is not intended that any employer-employee relationship be established between HRCP and [Protecnium], either expressly or by implication." Protecnium Subcontract, Attachment A, Section 4.1.

58.    The Protecnium Subcontract further provides that Protecnium "is not an agent of HRCP and has no authority to act on behalf of or to represent to anyone that he, she or it is authorized to act on behalf of or to bind HRCP in any manner."  Protecnium Subcontract, Attachment A, Section 4.2.

59.    Pursuant to the Protecnium Subcontract, defendants Ramirez, Garcia, and Cortijo, – all employees of Protecnium – were brought on to the Project as Project Survey Manager (Ramirez) and as Survey Party Chiefs (Garcia, Cortijo), respectively.

60.    An HRCP spreadsheet from early 2022 lists nine (9) Protecnium Personnel working on the Project, seven (7) of which are listed as surveyors, including defendants Ramirez, Garcia, and Cortijo.  This spreadsheet lists the Protecnium employees' salaries and specifies which subcontract and/or change order funds each portion of each Protecnium employee's pay, including that of defendants Ramirez, Garcia, and Cortijo.

61.    Protecnium never submitted the necessary paperwork to HRCP to comply with Title VI of the Civil Rights Act of 1964 or the numerous other laws and regulations that apply to public works projects that use public funds.

62.    Even though defendants Ramirez, Garcia, and Cortijo were Protecnium employees, they consistently and repeatedly held themselves out as HRCP employees.  They used HRCP email addresses, told others that they worked for HRCP and/or Dragados, and drove HRCP company vehicles emblazoned with the HRCP logo.  By contrast, they hid their affiliation with Protecnium. All of this led Jason Heck of LTS to reasonably believe that Ramirez, Garcia, and Cortijo worked for HRCP.

63.    On July 26, 2021, the HRCP Survey Department published a request for bids for survey work on the Project.  The request for bids asked surveying companies to prepare bids for

four (4) surveyors on a full-time schedule over a period of thirty (30) months, at a flat rate per-month and per-surveyor.  *See* Exhibit 5, HRCP Scope of Works dated July 26, 2021.

64.    At or around the same time, Florence Yerian, an employee of Vinci and of HRCP ("Yerian"), emailed Steve Heck of LTS and asked LTS to submit a competitive bid for survey work on the Project.

65.    Yerian reached out to LTS through SmartBid, which is construction bidding software that allows for secure communication between prime contractors and subcontractors, and which provides a secure, confidential, and sealed bidding process.

66.    LTS was familiar with the SmartBid software and had used it when bidding on other projects.  LTS reasonably expected that its bid would be confidentially considered by HRCP through SmartBid without being disclosed to LTS's competitors, because that is the general practice in the industry and is the reason SmartBid is used.

67.    As of July 2021, LTS had no reason to believe that any bid it made would not be accepted and considered in confidence.  LTS reasonably expected that if it made a bid, such bid would not be revealed to any competitor.

68.    Shortly after hearing from Yerian, Steve and Jason Heck of LTS communicated with defendant Ramirez, who continued to represent himself as an employee of HRCP and of Dragados.  Like Yerian, Ramirez asked LTS to submit a bid for survey work on the Project. Ramirez said that he had heard good things about LTS and wanted them to be involved in the Project.

69.    Ramirez did not disclose his employment with Protecnium to LTS before asking LTS to submit a bid.

70.    On August 10, 2021, LTS submitted a bid to HRCP through SmartBid for survey work on the Project.  The bid was addressed to Ramirez in his role with HRCP.

71.    On September 13, 2021, Yerian emailed Steve Heck of LTS and asked whether the bid was LTS's best and final offer.  The same day, and at Yerian's request, Steve Heck of LTS submitted a final bid to Yerian via email.  This bid was also addressed to Ramirez in his role with HRCP.  *See* Exhibit 6, Land to Sand Proposal dated Sept. 13, 2021.

72.    Consistent with HRCP's request for bids, LTS's final bid offered skilled survey work on the Project at a rate of $18,988 per-month per-surveyor for four (4) surveyors for a term of thirty (30) months.  The total Project Cost per-surveyor was estimated at $569,640 ($18,988 x 30).  Attached to the proposal were the resumes of four LTS surveyors – Jason Heck, Leroy Heck, Kevin Barnes, and Peter Pucci.  Based on HRCP's representation that it wanted four (4) full-time surveyors for thirty (30) months, LTS anticipated the total value of the bid to be $2,278,560 ($569,640 x 4).

73.    Through their oral and written representations, the requirements of the Prime Contract that the bidding proceed through Good Industry Practice and in accordance with Virginia Law, and their representations that bidding would be processed through SmartBid, Ramirez and HRCP were in a fiduciary relationship with LTS with respect to the confidentiality of the content of LTS's bid.  As fiduciaries, Ramirez and HRCP owed a duty to LTS and were bound to act in good faith and with due regard for the interests of LTS in the confidentiality of their bid.

74.    Neither Ramirez, Yerian, nor anybody else at HRCP ever told LTS or otherwise implied that HRCP would share the information contained in LTS's bid with Protecnium, LTS's competitor for survey work on the Project.

75.    On October 18, 2021, in an email to Steve Heck of LTS, Ramirez said that the HRCP "Executive Committee has decided not to bring more survey staff for now."

76.    But Ramirez had not told Steve Heck the complete truth.  By the end of September, 2021, HRCP had agreed to pay Protecnium for five (5) Survey Managers/Party Chiefs for an additional twelve (12) months.  *See* Protecnium Change Order #9.  Some of these surveyors were new to the Project.

77.    Ramirez, HRCP, and Protecnium used and relied upon LTS's final September 2021 bid when preparing the HRCP and Protecnium proposals that resulted in the hiring of the additional Survey Managers/Party Chiefs in Protecnium Change Order #9.

78.    Neither Ramirez nor HRCP disclosed Protecnium's September 2021 change order to anyone at LTS.

79.    On or about March 8, 2022, Ramirez contacted Steve Heck of LTS to inquire about LTS's availability to perform survey work on the Project.  Steve Heck asked Ramirez when he might need the surveyors.  Ramirez emailed Steve Heck that HRCP was "just assessing. Management was not in favor of sourcing out survey but things might change."  This provided yet another reason for LTS to reasonably believe that the HRCP partners were performing the survey work themselves.

80.    On March 10, 2022, Ramirez texted Steve Heck of LTS to inquire whether LTS would maintain the same rates for the surveyors as in its September 2021 bid.  Steve Heck of LTS replied via text that LTS would maintain the same monthly rate per surveyor of $18,988 so long as the scope of work remained the same.  Ramirez confirmed to Steve Heck that the Scope of Work remained the same.  *See* Exhibit 7, March 10, 2022 text messages between Steve Heck and Rafael Ramirez.

81.     On March 15, 2022, and at Ramirez's request, Jason Heck and Leroy Heck of LTS met with Ramirez at the HRCP offices in Norfolk for a formal interview.  Also present at the interview was Kevin Cahoon ("Cahoon"), the Marine Survey Manager for the Project and a Dragados employee.

82.     Ramirez led the interview and represented himself as an HRCP manager.  He did not mention his employment with Protecnium.

83.     During the interview, Ramirez asked Heck about LTS's experience with Bidwell setups and bridge deck layouts.  Heck detailed his and LTS's extensive experience in these areas. Cahoon and Ramirez both said that it was important to have people on hand with experience in Bidwell setups and bridge deck layouts, implying that the surveyors currently on site did not have such experience.

84.     Unbeknownst to LTS, Protecnium had submitted a competing bid for survey work on the Project on or about March 9, 2022.  This bid, which was addressed to Ramirez in his role at HRCP, offered a "Senior Survey Party Chief" at a rate of $18,950 per month and a "Survey Party Chief" at a rate of $16,950 per month.  The bid was purportedly electronically signed by Sebastian Betti, who represented himself as CEO of Protecnium.  This bid did not submit the names or resumes of any surveyors.

85.     Protecnium's March 2022 bid was in fact prepared by Ramirez.  Addressing this bid to himself in his role as Project Survey Manager for HRCP, Ramirez priced Protecnium's Senior Survey Party Chief rate at just $38 per-month under the price articulated in the Land to Sand Proposal.

86.     Ramirez and Protecnium relied upon LTS's confidential and closed bid when Ramirez prepared Protecnium's competing bid in March 2022.  He priced Protecnium's bid at just

under LTS's monthly rate per-surveyor in an attempt to convince HRCP management to hire Protecnium instead of LTS.

87.    On March 11, 2022, and then again on April 1, 2022, Ramirez prepared comparison tables that compared Protecnium's March 9, 2022 bid to LTS's bid from September 2021.  He made these comparison tables in order to lobby HRCP executives to hire Protecnium instead of LTS.  Ramirez signed off on each Comparison Table for HRCP even though he was an employee of Protecnium, and even though he was mired in a conflict of interest.

88.    At the time of its March 2022 bid, Protecnium did not have a "Senior Survey Party Chief" or a "Survey Party Chief" available to be hired on to the Project.  Staffing issues at Protecnium would have prevented Protecnium from fulfilling its March 2022 bid, had it been accepted by HRCP.

89.    In April of 2022, Ramirez told Steve Heck of LTS that the HRCP management would approve LTS's subcontract for survey work on the Project.

90.    On April 21, 2022, Yerian emailed Steve Heck of LTS and said: "Good Afternoon Steve, We are in receipt of your proposal for the services of a Surveyor and would like to send you a subconsultant agreement for same."  Attached to the email was a file entitled "HRCP Subconsultant Agreement – 2022 0203.docx" with the "Scope of Services" section left blank.  *See* Exhibit 8, April 21, 2022 Email from Florence Yerian to Steve Heck, Subject "Fwd: Request for Surveyor".

91.    Based on these communications from Ramirez and Yerian, LTS reasonably believed that HRCP wanted to hire LTS for the Scope of Works outlined in July 2021, and for which LTS had submitted its bid in September 2021.

92.     LTS promptly contacted VDOT to obtain its Title VI approval, as was required under the Prime Contract.   *See* Exhibit 3, Prime Contract Exhibit 26, "Section II. Nondiscrimination."

93.     On or about May of 2022, Ramirez contacted Jason Heck of LTS to tell him that the survey contract would only be for one surveyor and would only extend for six (6) months, contrary to the original request for bids which had specified a thirty (30) month term for four (4) surveyors.  Ramirez further said that the one surveyor would have to be LTS's most senior Survey Party Chief, Jason Heck.

94.     Ramirez told Jason Heck that HRCP did not want to be locked into a long-term contract with LTS, but did not explain why.  Ramirez said that if the six-month term went well, HRCP would sign another contract with LTS for a longer term and for more surveyors.  Ramirez continued to represent himself as an HRCP employee during this conversation with Heck.  He did not tell Jason Heck or LTS about his ongoing employment with Protecnium or Protecnium's March 2022 bid for HRCP surveying services.

95.     Ramirez's and HRCP's request for a shorter term of contract surprised LTS because Ramirez and HRCP had pursued them, not the other way around.  Ramirez and HRCP had asked LTS to submit a bid and told LTS that they wanted LTS to help with the Project.  Neither Ramirez nor anyone else at HRCP had expressed any misgivings about working with LTS to that point.  It also surprised LTS because in March 2022 Ramirez had told Steve Heck that the Scope of Work remained the same.

96.     After internal deliberation, LTS decided to accept the amended contract from HRCP even though the shorter term of contract was contrary to the usual business practice in the construction industry.

97.     Common practice (and "Good Industry Practice") in the construction industry is to award a contract for the posted scope of work and to terminate these long-term contracts early if and when issues arise.

98.     LTS accepted and agreed to the amended contract in part because of Ramirez's oral representations about HRCP extending and expanding the contract or signing another contract with HRCP at the end of the initial six-month term.

99.     On June 22, 2022, LTS and HRCP agreed to a Survey Support Subconsultant Agreement ("LTS Subcontract").  *See* Exhibit 9.  This agreement required HRCP to pay LTS a total of $113,928 over six (6) months for the use of one field Surveyor.  The cost per-month per-surveyor was $18,988, which was the same as LTS's final bid in September 2021.

100.    Orally, Ramirez and HRCP asked that LTS fulfill the LTS Subcontract by using its most experienced Senior Party Survey Chief, Jason Heck.

101.    HRCP's subcontract with LTS expressly incorporates the Prime Contract and all of its attachments, including the General Conditions referenced above requiring the use of Good Industry Practice, and including the "competitive sealed bidding" and "competitive negotiation" procedures that are required by Virginia law to be incorporated in the Prime Contract.  *See* Exhibit 9, LTS Subcontract, Sections 2.1 and 2.2.

102.    The LTS Subcontract provides that "all procedures, systems, programs, methods, and Documents, whether written, oral, or electronic, *created* in whole or in part *as a result of* this Agreement, shall be the exclusive property of [HRCP]".  *See* Exhibit 9, LTS Subcontract, Section 7.3 (emphasis added).

103.    The LTS Subcontract does not transfer ownership of any LTS trade secrets that predate the LTS Subcontract.  Nor does the LTS Subcontract allow HRCP to obtain LTS trade secrets through deceit and transfer them to another subcontractor like Protecnium.

104.    The LTS Subcontract was set to expire six (6) months after it was ratified, *i.e.* on December 22, 2022.

105.    LTS's responsibility under the subcontract was to help survey the marine-side bridges – the most difficult work on the Project.  Other surveyors were handling the land side bridge surveying work.  LTS reasonably believed that the other surveyors on site worked directly for HRCP.

106.    On June 22, 2022, LTS began working for HRCP.  Jason Heck, Senior Party Chief Surveyor for LTS, was on site nearly every day.

107.    Jason Heck reported directly to Cahoon.  In turn, Cahoon reported to Ramirez, who was the Project Survey Manager for HRCP.  Jason Heck regularly interacted with and received instruction directly from Ramirez as well as from Ramirez through Cahoon.

108.    When they began working on the Project, Jason Heck and LTS did not know that Ramirez was employed by Protecnium.  They likewise did not know that several other surveyors on site, including defendants Garcia and Cortijo, also worked for Protecnium.  They continued to believe, consistent with Ramirez's prior representations, that Ramirez and the on-site surveyors worked for HRCP and Dragados.

109.    When Jason Heck started working on the Project in June of 2022, he discovered that the Project was in shambles.  No bridge deck pours had been done.  No Bidwells had been set up.  The bridge deck layout had not even been completed.  Indeed, there appeared to have been no consistent plan in place and little oversight pertaining to bridge deck layout.

110.     When Jason Heck arrived on the Project in June 2022, he discovered that there was not a single surveyor on site who had ever done screed rail setups and Bidwell setups like this before except for Kevin Cahoon, his immediate supervisor.  The other surveyors on site did not seem to know what was required for this project.

111.     When Jason Heck began working on the Project, he was given an email address for use on the Project: jheck-ext@hrcpjv.com.  Ramirez provided him with this email address in an email to Heck on June 29, 2022 from Ramirez's HRCP email address: rramirez@hrcpjv.com.  Copied on this email was Javier Cortijo at his HRCP email address: jcortijo@hrcpjv.com.  Ramirez's email to Heck concluded with his signature, which represented that he was "Project Survey Manager" for "Hampton Roads Connector Partners". *See* Exhibit 10, June 29, 2022 email from Ramirez to Jason Heck, Subject "Welcome to HRCP, Jason".  The email contained no representation that Ramirez or Cortijo worked for Protecnium.

112.     Jason Heck would later interact with defendant Garcia over email.  Garcia likewise had an HRCP email address: bgarcia@hrcpjv.com.

113.     Ramirez told Heck that all subcontractors had to have email addresses ending in "-ext" so that everyone knew that they were not HRCP employees.  From this, Heck and LTS reasonably believed that Ramirez, Cortijo, Garcia, and anyone else with an HRCP email address that did not include "-ext" were HRCP employees.

114.     Jason Heck also observed that Ramirez, Cortijo, and Garcia drove around the work site in vehicles emblazoned with the HRCP logo.  From this, Heck reasonably believed that Ramirez, Cortijo, and Garcia were HRCP employees.

115.    During Jason Heck's first several months on site, he was not aware that there were other sub-contracted surveyors on site.  Indeed, Heck was led to believe, and did believe, that the other surveyors on site worked directly for the HRCP partners.

116.    August 1, 2022 was scheduled to be the day that the first screed rail as-built was done in order to ensure that the bridge crews were setting the screed rail to the correct elevation.  Present were Jason Heck of LTS, Cahoon, defendant Cortijo, and the superintendent of the bridge crew.  During this process, the parties discovered that the bridge crew had set the rail at the incorrect elevation.  Cahoon began arguing with the bridge deck superintendent about who was responsible for the error.  Eventually Jason Heck stepped in and told Cahoon and the bridge deck superintendent about LTS's different approach to bridge deck surveying.  Heck told everyone present, including defendant Cortijo, that LTS works directly with bridge crews to set each bolt properly as it is installed.  He explained that LTS typically sets the rail and performs the screed rail as-built at the same time, and further explained that by surveying each bolt alongside the bridge crew, errors can be promptly caught and corrected.

117.    On or about that day, Heck instructed defendant Cortijo, Cahoon, and the bridge deck superintendent about how to properly survey bridge deck rail setting while performing a screed rail as-built.

118.    Heck even sent Cahoon a screed rail survey workplan that Heck had internally developed for LTS with the expectation that Cahoon would share it with the rest of the team.  This instruction included trade secrets that LTS had developed over its years of experience.

119.    The screed rail survey workplan that Heck sent to Cahoon is one of several workplans that will be included in a textbook that LTS and Heck are preparing for a construction survey trade school that Heck has been developing for several years.  The instruction provided to

Cortijo, Cahoon, and the bridge deck superintendent on or about August 1 likewise will be included in this trade school course. The goal of the trade school will be to instruct construction company employees on proper construction surveying practices, procedures, and techniques.

120.    There is a market for such instruction, which Jason Heck and LTS are uniquely situated to provide.

121.    Heck reasonably believed that everyone with whom he communicated on or about August 1, 2022, including defendant Cortijo, was an HRCP employee. He did not know, and had no reason to believe, that Cortijo worked for LTS's competitor Protecnium. Consequently, he did not know that he had divulged trade secrets to LTS's competitor.

122.    HRCP adopted Jason Heck and LTS's methods and constructed a bridge deck bolt by bolt over the next few weeks. Heck closely supervised the work and caught several mistakes in the process, including the following:

    a.    On August 4, 2022, Jason Heck of LTS discovered that a pier cap was not built correctly. He brought the mistake to the attention of HRCP management, thereby saving the Project from making an unnecessary critical lift.

    b.    On August 8, 2022, Jason Heck of LTS discovered that the deck pan crew had set the bridge deck pans at the wrong elevation. Heck discovered this error before the installation of rebar, thereby saving the Project significant time and expense.

    c.    On August 19, 2022, Jason Heck of LTS discovered that a precast bridge was built at a three (3) percent grade in one location and at a two (2) percent grade at another location – a significant difference in grade. Heck discovered this error before the concrete was poured, saving the Project significant time and money.

123.    By August 26, 2022, the team had successfully poured a near-perfect bridge deck. Cahoon sent everyone on the team a congratulatory message that morning.

124.    Later on August 26, 2022, Ramirez scheduled a meeting labeled "bridge deck layout".  The stated purpose of the meeting, according to Ramirez, was to "have a consistent process cross the board."  Among the required attendees were Ramirez, Cahoon, Jason Heck of LTS, and defendant Garcia, who worked on the land side surveying team.  *See* Exhibit 11, Bridge Deck Layout Meeting Notice.

125.    The bridge deck layout meeting scheduled by Ramirez occurred on September 1, 2022.  Present were Jason Heck of LTS, Ramirez, Cahoon, and Garcia, among others.  During this meeting Ramirez asked Heck to provide the LTS method for troubleshooting and surveying bridge deck layouts.  Heck explained that LTS uses the following method for bridge deck layouts and setting up the screed rails:

   a.  Record elevations along the top of the beam to calculate deck pan placement;

   b.  Place the deck pans, and as-built the deck pans to ensure they are right;

   c.  Set the screed rails;

   d.  Set up the bid wells.

   e.  Work alongside the bridge crew to survey each bolt as they set the rail and simultaneously performing the rail as-built.

126.    At the conclusion of the meeting, Ramirez told the parties present, including Garcia, to use the Heck/LTS method going forward on both the land-side and marine-side bridge work.

127.    During the September 1 meeting, Ramirez discussed the critical deck pours that were coming up on the land side of the Project, which was Garcia's responsibility. These bridge pours would connect the land-side project to an already-existing bridge – a difficult task.  Ramirez

asked Heck, who was the only surveyor present with significant experience in this kind of work, to explain to Garcia and others how to properly survey these critical bridge pours. Heck did so.

128.    Heck's instruction on or about September 1, 2022 included trade secrets that LTS had developed over its years of experience, and which will be included in LTS and Heck's forthcoming textbook and trade school course.

129.    Heck reasonably believed that everyone with whom he communicated on or about September 1, 2022, including defendants Ramirez and Garcia, were HRCP employees. He did not know that Ramirez and Garcia worked for LTS's competitor Protecnium. In short, he did not know that he had divulged trade secrets to LTS's competitor.

130.    Also on September 1, 2022, Ramirez held a social gathering for the HRCP survey team at a Norfolk-area brewery. Dozens of people were invited to the gathering – all of the surveyors on the Project, plus their helpers as well. Among those invited were Jason Heck, Cahoon, Garcia, and Cortijo. *See* Exhibit 12, Email from Rafael Ramirez, Subject "Re:  Thirsty Thursday", dated August 29, 2022.

131.    At the social gathering, Ramirez opened a tab and paid for everyone's drinks and food using an HRCP company credit card.

132.    Based on the fact that Ramirez used an HRCP company card to pay for expenses from an HRCP social gathering, Heck reasonably believed that Ramirez was an HRCP employee.

133.    On September 9, 2022, Ramirez asked Jason Heck of LTS to go to a land side bridge and give it a final check before the first deck pour. Defendant Garcia had previously surveyed this work, ostensibly following Heck's teachings. Heck discovered that Garcia had made a critical error. The deck pans were too high and would not allow for the correct bridge deck thickness. If this error went uncorrected, structural integrity would be compromised. Heck

immediately told Ramirez about the problem.  The deck pours had to be canceled until the deck pans were installed correctly.

134.    That day Ramirez came to the site of the critical mistake and asked Jason Heck to show and explain how he had caught Garcia's critical mistake.  Heck explained to Ramirez that he had checked the Bidwell and noticed that it had a crown in it where it was supposed to be straight and flat.  Heck further told Ramirez that in the future, the deck pan as-built should proceed in smaller increments in order to prevent this type of error.

135.    Jason Heck still did not know that Ramirez and Garcia worked for his competitor Protecnium.  Based on their representations, he still reasonably believed that they worked for the HRCP partners.

136.    Unbeknownst to Heck, he had again divulged trade secrets to his competitor on or about September 9, 2022.  These trade secrets were developed over his years of experience, and will be included in LTS and Heck's forthcoming textbook and trade school course.

137.    Around this time, Heck learned about an internal dispute within the group of surveyors that Heck believed to be employed by HRCP.  From prior interactions with the group, Heck knew that Ramirez and Cortijo did not like Cahoon.  But on or about early September 2022, Cortijo and Ramirez told Heck that they wanted Cahoon to be fired.  They further told Heck that Cahoon was entrenched on the Project to such an extent that the only way he would be fired is if he made a major mistake.

138.    On September 21, 2022, HRCP and LTS agreed to modify the LTS Subcontract by incorporating Change Order 1, which added an additional LTS senior surveyor, Kevin Barnes, to the Project for a term of three (3) months.   Barnes was to be paid $18,988 per month – the same

rate that Jason Heck was paid under the original contract. Change Order 1 was set to expire three (3) months from its enactment, or by December 21, 2022. *See* Exhibit 13, LTS Change Order 1.

139.    On September 23, 2022, Ramirez ordered Jason Heck to oversee the land side bridge operations. Ramirez specifically told Heck to instruct Garcia about how to survey bridge deck layouts. Heck did as he was told.

140.    On September 23, Jason Heck and LTS still did not know that Ramirez and Garcia worked for LTS's competitor Protecnium. Based on their representations, he still reasonably believed that they worked for the HRCP partners. Unbeknownst to Heck, he had again divulged trade secrets to his competitor on or about September 23, 2022, which secrets will be included in Heck's forthcoming textbook and trade school course.

141.    In late September, 2022, Cahoon pulled Heck aside and told him that Ramirez worked for Protecnium. Heck confronted Ramirez, who admitted to Heck that he was a Protecnium employee.

142.    Heck soon learned that Cortijo, Garcia, and other surveyors on site also worked for Protecnium. It was only at this time that Heck understood that he had been tricked into divulging trade secrets to his competitor.

143.    Had Heck known all along that he was dealing with surveyors employed by Protecnium, LTS's competitor, he would not have divulged trade secrets to them.

144.    Based on defendants' representations, until late September 2022, Heck and LTS believed that they were dealing with surveyors employed by Dragados and HRCP – LTS's partners on the Project. Heck and LTS wanted to help their partners on the Project for two primary reasons:

      a.    First, HRCP agents like Ramirez had promised Heck and LTS an extended and expanded survey subcontract if things went well in the first six (6) months. Heck and

LTS reasonably believed based on these representations that if LTS helped their partners on the Project, LTS's subcontract would be extended and expanded.

       b.      Second, Dragados and the other HRCP partners are repeat players in the highway construction industry, as is LTS.  LTS reasonably believed that if they helped their partners on the Project, LTS would be more likely to land survey work on other Dragados, Vinci, Flatiron, and/or DCB projects in the future.

145.    The employment affiliation of the on-site surveyors was a material fact that changed the nature of the trade secrets transaction for Heck and LTS.  What they had reasonably believed was instruction of LTS's partners on the Project was in reality the instruction of LTS's competition for surveying work.  Heck and LTS's reasonable belief that the instruction of the on-site surveyors would lead to future business opportunities for LTS was in fact the opposite – the instruction hurt LTS's business.  What Heck and LTS had reasonably believed was a mutually beneficial business arrangement was in fact one that benefitted LTS's competitor Protecnium at LTS's expense.

146.    On or about mid-November, 2022, Cahoon spoke with Heck about errors that Cahoon had noticed in the data sent to his collection device.  Before beginning surveying work on any given day, Cahoon and Heck would receive data in their respective collection devices.  These data were prepared by management and delivered by Ramirez, the Project Survey Manager, and told Cahoon and Heck what the proper measurements were on any given task.  Cahoon told Heck that he had checked and re-checked his calculations, and said that he was sure that the data provided was wrong.  Cahoon told Heck that he suspected Ramirez was trying to sabotage his work in order to get him off the Project.

147.     Based on this statement by Cahoon, Heck's conversation with Ramirez and Cortijo where they said they wanted Cahoon to be fired, and other things Heck had observed to that point while working on the Project, Heck reasonably became suspicious that Ramirez (or someone else) might be intentionally altering the data that was delivered to the collection devices.

148.     On November 28, 2022, Cahoon was on vacation, and Cortijo was in charge of distributing the data to the collection devices.  That day Heck performed calculation checks on data that he received in his collection device.  He determined that the anchor bolt placement on the pier cap was in the wrong place in the data file – a huge error which, if left uncorrected, could have led to structural failure.

149.     Heck immediately called Cortijo to tell him about the mistake in the data.  Heck also took a picture of his collection device with his cell phone to preserve evidence of the error.  Shortly thereafter, Cortijo (or someone else) changed the data file from the office and uploaded the correct information to Heck's collection device.

150.     November 28, 2022 was also the day that HRCP, through its agent Ramirez, prepared a Change Order to extend and expand LTS's subcontract with HRCP.  This Change Order would have extended LTS's subcontract with HRCP by twelve (12) months, employed two (2) Senior Party Chief Surveyors during that time, and paid LTS an additional $455,712. The rate per-month per-surveyor remained at $18,988.  *See* Exhibit 14, LTS Change Order No. 2.

151.     Because the errors in the data appeared after Heck discovered that Ramirez and the other defendant surveyors worked for LTS's competitor Protecnium, and shortly before LTS's contract was set to expire, Heck suspected that Ramirez was trying to sabotage LTS's efforts in order to convince management not to extend LTS's contract.

152.    On December 7, 2022, Steve Heck of LTS sent HRCP, through Ramirez, a letter informing them that LTS would not be extending their contract.    The letter cites "mismanagement", "errors" in data files, and a lack of communication with the production team. *See* Exhibit 15, LTS Letter to HRCP on Dec. 7, 2022.

153.    On December 13, 2022, Heck found another major error.    While evaluating a portion of the South Maintenance of Traffic Bridge, Heck discovered that the bottom of the deck digital terrain model was built a half-inch lower than plan in some spans.    Before receiving the correct top-of-deck digital terrain model, the bridge was constructed with a bridge deck that was at a lower elevation than in the Project specifications.    This error could not be properly corrected because of how much of the bridge had already been constructed.    The specifications called for an 8.5-inch bridge deck, but the bottom of the deck digital terrain model was built with a 9 inch deck in certain spans, causing the bottom digital terrain model to be at a lower elevation than intended. Jason Heck promptly brought this problem to the attention of Ramirez, Cortijo and Cahoon.

154.    On December 14, 2022, a meeting occurred between Steve and Jason Heck of LTS, upper management of HRCP, and Ramirez.    Cahoon was also present.    HRCP management begged LTS not to leave the Project and asked what needed to be done to keep them on, stating that LTS provided high-quality work.    At this meeting, Jason Heck and LTS orally agreed to stay on the Project if certain changes were made by management.

155.    At the December 14 meeting, Cahoon said, in front of the HRCP upper management, that LTS would have the opportunity to sign a subcontract for multiple senior surveyors for a longer term whenever the Project required such assistance.    The HRCP upper management present expressed agreement with Cahoon's statement.

156.    On December 14, 2022, in follow up to that day's meeting, Ramirez sent Steve and Jason Heck of LTS an email thanking them for agreeing to stay on the Project.  In this email he referred to himself as an "HRCP Manager[ ]" and pledged to work on how "information is conveyed".  Cc'ed on this email from Ramirez were Robert Gianna and Danilo Abdanur, members of HRCP's management team.  *See* Exhibit 16, Ramirez email to Steve and Jason Heck on Dec. 14, 2022.

157.    On December 22, 2022 – the last day of the original contract – Jason Heck emailed Cahoon to say that LTS would sign the Change Order extending LTS's contract.  Jason Heck proposed an addition to the contract in order to address the issues he had experienced working with the data coming from Ramirez.  This addition would have expressly stated that HRCP would accept responsibility for all data provided to LTS, and LTS would take responsibility for the quality of the survey produced from these data.  *See* Exhibit 17, E-mail chain on Dec. 22, 2022, Subject "Contract Extension Clarification".

158.    Cahoon replied "I am good with this."  Cahoon cc'ed Ramirez and HRCP executives Danilo Abdanur, Michael Reinoehl, Robert Gianna, and Vicente Esquivel.  *See id.*

159.    Vicente Esquivel of HRCP replied to Cahoon that same day, saying "Kevin, it looks reasonable to me.  If operations are agreed is the best way to move forward."  Cahoon immediately forwarded Esquivel's email to Jason Heck.  *See id.*

160.    Accepting Cahoon and Esquivel's representations on behalf of HRCP, Jason Heck signed the contract extension on December 22, 2022.  *See* Exhibit 14, LTS Change Order No. 2. He reasonably believed that the HRCP executives would sign on behalf of HRCP within a few days.

161.    By December 30, 2022, Roger Lant of Flatiron and HRCP Project Manager Louis Brais had signed the LTS contract extension on behalf of HRCP. Only one signature remained outstanding – that of Juan Miguel Perez of Dragados. *See* Exhibit 14, LTS Change Order No. 2.

162.    While awaiting final signature on the LTS contract extension, Jason Heck of LTS continued appearing on site to work. He received regular assurances from Ramirez and others at HRCP, including Cahoon, that the LTS contract extension would be signed by the Dragados executive. Relying upon these representations, Heck continued to show up to work.

163.    On January 11, 2023, Jason Heck of LTS caught another mistake on Unit Five of the North Bridge. He discovered that the top and bottom model of the bridge were not built correctly. Heck brought this mistake to the attention of HRCP Management, thereby saving the Project significant time and expense.

164.    At the same time that Ramirez was giving Jason Heck and LTS assurances that the LTS contract extension would be signed by the Dragados executive, Ramirez was preparing contract proposals on behalf of Protecnium. He prepared at least three (3) such proposals on behalf of Protecnium on or about January 2023, each addressed to a different HRCP executive, in an attempt to acquire for Protecnium the survey work that had been offered to LTS.

165.    Ramirez was also busy preparing comparison tables. Each such table contained LTS's offer of $18,988 per surveyor per month, but Protecnium's quote changed in the tables. The first comparison tables prepared by Ramirez show that Protecnium was prepared to offer to perform surveying work for HRCP at $16,950 per-surveyor per-month. But later comparison tables show that Protecnium reduced its offer to $14,950 per surveyor per month.

166.    The reason for the change in the numbers was that Protecnium was only offering nine (9) hours of work per-surveyor per-working day, whereas LTS had offered twelve (12) hour

workdays per-surveyor. Protecnium's original quote of $16,950 per-surveyor per-month came out to $81.33 per-surveyor per-hour, whereas LTS's offer was $73.09 per-surveyor per-hour. Thus, Protecnium's first quote of $16,950 per-surveyor per-month was actually *more* expensive than LTS's $18,988 per-surveyor per-month on a per-hour basis. After Ramirez reduced Protecnium's quote to $14,950 per-surveyor per-month, Protecnium came in at $72.75 per-surveyor per-hour, just under LTS's $73.09 per-surveyor per-hour.

167. Ramirez shared these comparison tables and Protecnium proposals with HRCP executives in an attempt to convince HRCP executives to hire Protecnium for the work that had already been offered to LTS.

168. For the second time, Ramirez had referenced LTS's competitive bid when he prepared Protecnium's competing bid. He transparently calibrated Protecnium's quote so that Protecnium came out $0.34 cheaper than LTS on a per-surveyor per-hour basis. He used his access to LTS's bid information to subvert the bidding process and rig the bid for Protecnium.

169. HRCP's internal document tracking process records who creates and/or edits a document. Ramirez's electronic fingerprints are all over the comparison tables and Protecnium's bids.

170. On January 27, 2023 Ramirez texted Jason Heck and asked Heck to send him an offer for a contract extension on behalf of LTS.

171. Jason Heck was puzzled – LTS had already accepted the contract proposed by HRCP. Heck told Ramirez via text that LTS had accepted the contract extension that was offered on November 28, 2022.

172. Ramirez responded by attempting to void the electronic contract offer that Heck had already signed on behalf of LTS.

173.    Although Protecnium, through Ramirez, had access to LTS's confidential bid information and used this information to calibrate its own bids and to submit multiple such bids to HRCP, LTS was never shown Protecnium's proposals and was not given an opportunity to submit a competing bid.

174.    Only Protecnium, through Ramirez, had access to their competitor's bid information.  Ramirez and Protecnium used this information to rig the bidding process in their favor.

175.    HRCP allowed the bidding process to be rigged.  Throughout the time when he was rigging the bidding in Protecnium's favor, Ramirez was also working for HRCP as the Project Survey Manager.  HRCP knew that Ramirez was a Protecnium employee.  HRCP knew, or should have known, that Ramirez and Protecnium were using their access to LTS's confidential bid information to rig the bidding process in Protecnium's favor by setting Protecnium's price at just under LTS's on a per-hour basis.

176.    On January 28, 2023, a whistleblower employed by HRCP met with Jason Heck. At the meeting, the whistleblower told Jason Heck that HRCP, Protecnium, and Ramirez had rigged the bidding on the survey subcontract for Protecnium and to LTS's detriment.    The whistleblower gave Heck internal HRCP comparison tables and other documents and described to Heck the process by which the bidding was rigged in Protecnium's favor.

177.    In February 2023, LTS withdrew from another contract with Dragados worth $108,000 upon learning that Protecnium surveyors were involved with the Project.

178.    On February 22, 2023, LTS, through undersigned counsel, sent an anti-spoliation letter to HRCP executives.

179. On February 27, 2023, HRCP contracted with Protecnium for survey work at a rate of $14,950 per-surveyor per-month. This contract was for the work originally offered to LTS, and more. LTS had only been offered a contract for two Survey Party chiefs for twelve (12) months. But on February 27, 2023, HRCP contracted with Protecnium for four (4) Survey Party Chiefs for twelve (12) months, thereby doubling the value of the contract that had been offered to LTS. *See* Protecnium Change Order No. 11.

180. In March 2023, Ramirez gave notice to stop working on the Project and for HRCP and announced that he was going to work for another company.

181. On March 23, 2023, Dragados posted a job opening for a "Survey Manager on the . . . Hampton Roads Bridge Tunnel Expansion Project" – the position previously provided by Protecnium through Ramirez.

182. LTS has not been paid for the work it did between the expiration of its first contract with HRCP on December 22, 2022, and its last day on site, January 27, 2022, which is when Ramirez attempted to void the contract extension offer to LTS.

183. LTS has not been paid for the trade secrets and expertise that they unknowingly disclosed to Protecnium, its competitor. The market value of these trade secrets is One-Million Dollars ($1,000,000).

184. One of LTS's competitors in the highway construction surveying business, Johnson Bernat Associates, Inc. ("JBA"), has paid LTS hundreds of thousands of dollars over the past two years in order to benefit from LTS's extensive knowledge and expertise in bridge and construction surveying. *See* Exhibit 18, LTS Invoices to JBA and Payments from JBA.

185.    This is not the first time that Dragados has colluded and conspired with another company on a public construction contract.  Indeed, Dragados has a long history of anticompetitive and collusive behavior related to public construction contracts like this one.

186.    In July 2022, after an extensive investigation, the Comision Nacional de los Mercados y la Competencia ("CNMC") – the National Commission of Markets and Competition in Spain – determined that Dragados USA's parent company, Dragados S.A., violated Article 1 of the Spanish Competition Law and Article 101 of the Treaty of the Functioning of the European Union by "altering the competitive process in infrastructure construction tenders for more than 25 years." *See* Exhibit 19, July 7, 2022 Press Release by the CNMC at *1.

187.    The CNMC determined that Dragados S.A., acting in collaboration with several other construction companies doing business in Spain, shared technical bids and exchanged information with co-conspirator bidders on public construction contracts, thereby "breach[ing] the duty to submit a single tender and the duty of secrecy of tenders and eliminat[ing] the independence required of companies in public procurement procedures." *Id.* at *2–3.

188.    The CNMC found that Dragados S.A.'s collusive agreements with the co-conspirator companies reduced competition and placed non-colluding companies at a competitive disadvantage, and therefore sanctioned Dragados S.A. € 57.1 million for its anticompetitive behavior. *Id.* at *3.

**COUNT I – *Quantum Meruit* and Breach of Implied Contract
(Defendants HRCP, Dragados, Vinci, Flatiron, and DCB)**

189.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

190.    Defendants HRCP, Dragados, Vinci, Flatiron, and DCB expressly promised to pay LTS $18,988 per-month and per-surveyor in the LTS Subcontract in June 2022 and in LTS Change Order 1 in September 2022.

191.    The LTS Subcontract called for one (1) Senior Party Surveyor on site.  LTS Change Order 1 added one (1) additional Senior Party Surveyor, for a total of two (2) Senior Party Surveyors on site.

192.    These contracts were set to expire by December 22, 2022.

193.    On November 28, 2022, Defendants HRCP, Dragados, Vinci, Flatiron, and DCB, through their agents, offered to extend LTS's contract for an additional twelve (12) months at the same number of surveyors and at the same price per-surveyor per-month.

194.    LTS, through its agent Jason Heck, agreed to LTS's proposal by December 22, 2022.

195.    Defendants HRCP, Dragados, Vinci, Flatiron, and DCB, through their agents, represented to LTS that LTS's contract would be extended.

196.    Relying upon Defendants' representations, LTS remained on site and working from December 22, 2022 to January 27, 2023.  LTS eschewed other work opportunities during this time.

197.    LTS has not been paid for its work between December 22, 2022 and January 27, 2023.

198.    Defendants' nonpayment constitutes a breach of implied contract and justifies recovery in *quantum meruit*.

199.    Defendants' breach of implied contract has caused Plaintiff LTS to suffer damages in the amount of Forty-Seven-Thousand-and-Four-Hundred-Seventy Dollars ($47,470).   This constitutes the value of the contract to LTS from December 22, 2022 to January 27, 2023.

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants HRCP, Dragados, Flatiron, Vinci, and DCB, jointly and severally, in the amount of Forty-Seven-Thousand-and-Four-Hundred-Seventy Dollars ($47,470), plus reasonable attorney fees and costs, and such other and further relief this Court may deem just and proper.

### COUNT II – Breach of Contract
### (Defendants HRCP, Dragados, Vinci, Flatiron, and DCB)

200.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

201.    On November 28, 2022, Defendants HRCP, Dragados, Vinci, Flatiron, and DCB, through their agents, offered to extend LTS's existing contract for another twelve (12) months beyond December 22, 2022, at the same terms: two (2) Senior Party Surveyors on site at a rate of $18,988 per-surveyor per-month.

202.    On December 22, 2022, Plaintiff LTS, through its agent Jason Heck, accepted Defendants' November 28 offer to extend LTS's contract.

203.    Defendants HRCP, Dragados, Vinci, Flatiron, and DCB further agreed to the contract extension with LTS when their agents Roger Lant and Louis Brais signed the contract extension on December 26 and December 30, 2022, respectively.

204.    Jason Heck's proposed addition to the contract – *see* ¶ 157 and Exhibit 17 – was not a counteroffer, and was a proposed additional term to the contract which LTS could have accepted or rejected, and which did not affect LTS's acceptance of Defendants' offer.

205.    The aforementioned offer and acceptance were for an adequate and valid consideration.

206.    Plaintiff LTS relied upon this valid contract by, for example, foregoing other business opportunities and clearing Senior Party Chief surveyors Jason Heck's and his associate's schedule during the term of the twelve (12) month extension.

207.    Defendants HRCP, Dragados, Vinci, Flatiron, and DCB breached the contract when they did not pay LTS for its performance between December 22, 2022 and January 27, 2023.

208.    There was a further anticipatory breach of contract by Defendants HRCP, Dragados, Vinci, Flatiron, and DCB when their agent, defendant Ramirez, attempted to renegotiate the terms of the already-accepted contract and then attempted to void the already-accepted contract on January 27, 2023.

209.    Defendants' breach of contract has caused Plaintiff LTS to suffer damages of a contract expectancy in the amount of Four-Hundred-Fifty-Five-Thousand-and-Seven-Hundred-Twelve Dollars ($455,712) – that is, the full value of the twelve-month extension.

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants HRCP, Dragados, Flatiron, Vinci, and DCB, jointly and severally, in the amount of Four-Hundred-Fifty-Five-Thousand-and-Seven-Hundred-Twelve    Dollars    ($455,712),    plus reasonable attorney fees and costs, and such other and further relief this Court may deem just and proper.

### COUNT III - Fraud
**Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium, Ramirez, Cortijo, Garcia**

210.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

211.    Defendants made numerous false representations to Plaintiff, including:

    a.   That the bidding process was confidential, competitive, sealed, and would follow Good Industry Practice and Virginia Law;

    b.   That Ramirez, Garcia, Cortijo, and other surveyors on site worked for HRCP and/or Dragados, and not for another subcontractor like Protecnium;

    c.   That the trade secrets and methods divulged by Jason Heck to the other surveyors on site like Ramirez, Garcia and Cortijo would be used solely to complete the Project (and impliedly, not to harm LTS's business interests);

    d.   That HRCP would agree to extend and expand its contract with LTS by the end of 2022; and

    e.   That the contract extension offered to LTS on November 28, 2022 was in fact a contract offer and would be signed by the HRCP executives.

212.    These false representations were material and were relied upon by LTS when it decided to bid, when it decided to divulge trade secrets, and when it cleared its schedule and decided to forego other work opportunities.

213.    When Defendants made these false representations, they knew that they were false.

214.    When Defendants made these false representations, they did so with the intent to deceive Jason Heck and LTS and/or with a reckless disregard for LTS's interests, and with the intent to profit therefrom.

215.    Jason Heck and LTS relied upon these false representations to LTS's detriment by, for example, bidding on the work, entering into the subcontract with HRCP, disclosing trade secrets under false pretenses, and by foregoing other work opportunities.

216.    As a result of Plaintiff's reliance on these material misrepresentations, Plaintiff LTS has suffered damages of stolen trade secrets, loss of contract expectancy, opportunity cost of not bidding on projects it believed it would be unavailable for, and injury to its business reputation in the amount of Three-Million Dollars ($3,000,000).

217.    Defendants' misrepresentations were malicious, willful and wanton and therefore justify an award of punitive damages.

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Ramirez, Cortijo, and Garcia, jointly and severally, in the amount of Three-Million Dollars ($3,000,000), plus punitive damages in the amount of Three-Hundred-and-Fifty-Thousand-Dollars ($350,000), plus reasonable attorney fees and costs, and such other and further relief this Court may deem just and proper.

### COUNT IV – Breach of Fiduciary Duty – Confidential Bid Information
### (Defendants Ramirez, HRCP, Dragados, Vinci, Flatiron, and DCB)

218.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

219.    A fiduciary relationship existed between Defendants Ramirez, HRCP, Dragados, Vinci, Flatiron, and DCB and Plaintiff LTS with respect to the confidential information contained within LTS's bid for the HRCP survey contract.

220.    HRCP represented through its agreement to the terms of the Prime Contract with VDOT, its request for bids, its representation that bids would be processed confidentially through SmartBid, and through statements made by its agents, such as Ramirez, that this would be a competitive bidding process that followed Virginia Law and Good Industry Practice and which would maintain the confidentiality of the information, including price per-surveyor per-month, submitted by bidders like LTS.

221.    LTS relied on Ramirez and HRCP's representations and reasonably believed that the information contained within its September 2021 bid would be held confidentially by Defendants and would only be used by Defendants to determine which survey company to hire.

222.    As fiduciaries, Defendants Ramirez, HRCP, Dragados, Vinci, Flatiron, and DCB were bound by duties of care, good faith, confidentiality, prudence, and loyalty with respect to the confidential information submitted by LTS in its competitive bid.

223.    Defendants breached their fiduciary duty because Ramirez was an employee of Protecnium, LTS's competitor, at the same time that he represented himself as an HRCP employee. When LTS submitted its bid to Ramirez in his role with HRCP, the information immediately became known to Ramirez as Protecnium's agent.  Thus, Ramirez's access to the information submitted by LTS in its competitive bid was itself a breach of Ramirez and HRCP's fiduciary duty to LTS.

224.    Defendants further breached their fiduciary duty when Ramirez, in his role as Survey Project Manager for HRCP, used and relied upon LTS's confidential pricing data to construct Protecnium's bids.  Protecnium should never have had access to LTS's confidential bid information, and it should not have been able to use the information to construct its own bids.

225.    Defendants' breach of their fiduciary duty has caused Plaintiff LTS to suffer damages in the amount of Four-Hundred-Fifty-Five-Thousand-and-Seven-Hundred-Twelve Dollars ($455,712) – that is, the full value of the twelve-month extension, which was awarded to Protecnium as a result of the breach of fiduciary duty.

226.    Defendants' breach of fiduciary duty was willful, wanton, and tortious, and therefore justifies an award of punitive damages.

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants Ramirez, HRCP, Dragados, Flatiron, Vinci, and DCB, jointly and severally, in the amount of Four-Hundred-Fifty-Five-Thousand-and-Seven-Hundred-Twelve Dollars ($455,712), plus punitive damages in the amount of Three-Hundred-and-Fifty-Thousand-Dollars ($350,000), plus reasonable attorney fees and costs, and such other and further relief this Court may deem just and proper.

**COUNT V – Breach of Fiduciary Duty – Trade Secrets and Methods**
**(Defendants Ramirez, Cortijo, Garcia, HRCP, Dragados, Vinci, Flatiron, and DCB)**

227.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

228.    A fiduciary relationship existed between Defendants Ramirez, Cortijo, Garcia, HRCP, Dragados, Vinci, Flatiron, and DCB and Plaintiff LTS with respect to the trade secrets and methods shared by LTS with Defendants during LTS's time on the Project.

229.    These defendants were at an informational advantage compared to LTS.  Ramirez, HRCP, Dragados, Vinci, Flatiron, and DCB knew who they had hired to work on the Project.  They knew that certain surveyors on site worked for Protecnium, LTS's competitor, while that information specifically was concealed from Jason Heck and LTS.  Likewise, Cortijo and Garcia knew that they worked for Protecnium, LTS's competitor.

230.    HRCP, Dragados, Vinci, Flatiron, and DCB represented to LTS through its agreement to the terms of the Prime Contract to employ Good Industry Practice, through the terms of the LTS Subcontract, and through statements made by its agents like Ramirez, that the other surveyors on site worked for HRCP.

231.    Ramirez, Cortijo, and Garcia repeatedly represented that they worked for HRCP and Dragados through, for example, their email addresses, the trucks that they drove, through their email signatures, and through oral and written representations.

232.    LTS relied on Ramirez, Cortijo, Garcia, HRCP, Dragados, Vinci, Flatiron, and DCB's representations and reasonably believed that the other surveyors on site, including defendants Ramirez, Garcia, and Cortijo, worked for Dragados and/or HRCP.  LTS did not know, and had no reason to believe, that Ramirez, Cortijo, and Garcia worked for Protecnium, LTS's competitor.

233.    When Jason Heck of LTS, at Ramirez's request, revealed trade secrets and methods to Ramirez, Cortijo, Garcia, and to other surveyors working on the Project, LTS did not know, and had no reason to believe, that it was revealing trade secrets and methods to its competitor Protecnium and not to its partners on the Project.

234.    When Jason Heck of LTS revealed trade secrets and methods, he did so because he reasonably believed that it was necessary to complete the Project, because he wanted to help Ramirez, Cortijo, and Garcia, who he thought were his partners on the Project and not his competition, because Ramirez and others at HRCP represented that LTS's survey subcontract with HRCP would be extended and expanded at the end of the year, and because he thought helping LTS's partners would increase the chances of LTS being hired by Dragados, Vinci, DCB, and/or Flatiron on other highway construction projects in the future.

235.    Jason Heck and LTS reasonably believed that the revealed trade secrets and methods would be used by Ramirez, Cortijo, Garcia, HRCP, Dragados, Vinci, Flatiron, and DCB to complete the Project and not to advantage Protecnium and harm LTS's interests.

236.    As fiduciaries, Ramirez, Cortijo, Garcia, HRCP, Dragados, Vinci, Flatiron, and DCB were bound by duties of care, good faith, confidentiality, prudence, and loyalty with respect to the confidential trade secrets and methods revealed by Jason Heck of LTS to the other surveyors on site at Ramirez's request.

237.    Ramirez, Cortijo, Garcia, HRCP, Dragados, Vinci, Flatiron, and DCB breached their fiduciary duty because Ramirez, Garcia, and Cortijo were employees of Protecnium, LTS's competitor, but represented to LTS that they were HRCP employees.  They used, and continued to use, the revealed trade secrets and methods to benefit Protecnium and HRCP at LTS's expense by taking over the surveying subcontract that had been promised and offered to LTS.

238.    Upon information and belief, Ramirez, Cortijo, and/or Garcia later shared the confidential trade secrets and methods with other Protecnium employees, further damaging LTS's interests and enhancing Protecnium's.

239.    The trade secrets conveyed are also part of a textbook and trade school that Heck and LTS are developing, and for which they will charge money.

240.    Defendants' breach of fiduciary duty has caused Plaintiff LTS to suffer damages in the amount of One-Million-Four-Hundred-Fifty-Five-Thousand-Seven-Hundred-Twelve Dollars ($1,455,712) - that is, the value of the trade secrets conveyed, plus the full value of the twelve-month extension, which was awarded to Protecnium as a result of the breach of fiduciary duty.

241.    Defendants' breach of fiduciary duty was willful, wanton, and tortious, and therefore justifies an award of punitive damages.

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants Ramirez, Cortijo, Garcia, HRCP, Dragados, Flatiron, Vinci, and DCB, jointly and severally, in the amount of One-Million-Four-Hundred-Fifty-Five-Thousand-Seven-Hundred-Twelve Dollars ($1,455,712) plus punitive damages in the amount of Three-Hundred-and-Fifty-Thousand-Dollars ($350,000), plus reasonable attorney fees and costs, and such other and further relief this Court may deem just and proper.

### COUNT VI - Negligence
### (Defendants HRCP, Dragados, Vinci, Flatiron, and DCB)

242.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

243.    Due to the informational disparity between Defendants HRCP, Dragados, Vinci, Flatiron, and DCB on the one hand and Plaintiff LTS on the other, Defendants owed a duty of care

to LTS with respect to LTS's confidential bid information and to the trade secrets that LTS divulged to the other surveyors on site, including Ramirez, Cortijo and Garcia.

244.    Defendants HRCP, Dragados, Vinci, Flatiron, and DCB breached this duty of care when they negligently allowed Ramirez, an employee of Protecnium, to access LTS's confidential bid information and use it to his and Protecnium's advantage by calibrating Protecnium's bids to come in at just under LTS's bid.

245.    Defendants HRCP, Dragados, Vinci, Flatiron, and DCB further breached this duty of care when they allowed Ramirez, Cortijo and Garcia to falsely represent themselves as HRCP employees electronically and on the work site.

246.    Defendants HRCP, Dragados, Vinci, Flatiron, and DCB further breached their duty of care when they allowed Ramirez, an employee of Protecnium, to represent to Jason Heck of LTS that HRCP would extend and expand LTS's contract at the end of 2022.

247.    Defendants HRCP, Dragados, Vinci, Flatiron, and DCB further breached this duty of care when they allowed Ramirez, an employee of Protecnium, to convince Jason Heck of LTS to divulge LTS trade secrets to Ramirez, Garcia, and Cortijo, all of whom worked for LTS's competitor Protecnium, without first informing LTS of that fact.

248.    Defendants HRCP, Dragados, Vinci, Flatiron, and DCB further breached this duty of care when they allowed Ramirez and others at HRCP to represent to Jason Heck of LTS that the contract extension would be signed and agreed to by HRCP, when in fact Ramirez was working behind the scenes to shop LTS's bid to Protecnium, to rig the bidding process for Protecnium, and to convince HRCP executives not to extend LTS's contract.

249.    Defendants' negligence has caused Plaintiff LTS to suffer damages in the amount of        One-Million-Four-Hundred-Fifty-Five-Thousand-Seven-Hundred-Twelve        Dollars

($1,455,712) - that is, the value of the trade secrets conveyed, plus the full value of the twelve-month extension, which was awarded to Protecnium as a result of their negligence.

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants HRCP, Dragados, Flatiron, Vinci, and DCB, jointly and severally, in the amount of One-Million-Four-Hundred-Fifty-Five-Thousand-Seven-Hundred-Twelve Dollars ($1,455,712), plus reasonable attorney fees and costs, and such other and further relief this Court may deem just and proper.

### COUNT VII - Tortious Interference with a Contract and/or Business Expectancy
### (Defendants Ramirez, Cortijo and Protecnium)

250.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

251.    From June 22 to December 22, 2022, Plaintiff LTS and Defendants HRCP, Dragados, Vinci, Flatiron, and DCB were bound by contract.  In addition, during this time Plaintiff LTS had a business expectancy as a result of the representations made by HRCP agents, including Ramirez, that HRCP would extend and expand LTS's contract at the end of 2022.

252.    On November 28, 2022, HRCP offered to extend LTS's contract for twelve (12) months.  On December 22, 2022, LTS accepted HRCP's offer to extend the contract for a further twelve (12) months.

253.    Defendants Ramirez, Cortijo and Protecnium knew of the existence of LTS's contracts with Defendants HRCP, Dragados, Vinci, Flatiron, and DCB, and also knew of LTS's business expectancy of an expanded contractual relationship with HRCP in the future.

254.    Defendant Ramirez, acting as an agent for Protecnium, intentionally interfered with LTS's contract and business expectancy by unlawfully accessing LTS's confidential bid

documents and relying upon their confidential price terms to construct Protecnium's own bids for the same work.

255.    Defendant Ramirez, acting as an agent of Protecnium, further intentionally interfered with LTS's contract and business expectancy when Ramirez, along with defendants Cortijo and Garcia, hid their employment and affiliation with Protecnium from Jason Heck and LTS, misrepresented themselves as HRCP employees, and fraudulently induced Jason Heck of LTS to divulge trade secrets and methods to Protecnium surveyors, thereby diminishing the value of LTS's experience to their counterparty HRCP and enhancing the value of Protecnium's competing offer.

256.    Defendant Ramirez, acting as an agent of Protecnium, further intentionally interfered with LTS's contract and business expectancy when he convinced HRCP to only offer LTS a six (6) month term for one (1) surveyor, when the initial request for bids published by HRCP asked for a thirty (30) month term for four (4) surveyors.

257.    Defendants Ramirez and Cortijo, acting as agents of Protecnium, further attempted to intentionally interfere with LTS's contract and business expectancy when they conspired to manipulate and alter the data sent to Heck's collection device in an attempt to sabotage his work.

258.    Defendant Ramirez, acting as an agent of Protecnium, further intentionally interfered with LTS's contract and business expectancy when on January 27, 2023, Ramirez attempted to renegotiate the already agreed-upon contract extension between LTS and HRCP, and also by attempting to void the contract extension on behalf of HRCP.

259.    Ramirez and Cortijo did these things to harm LTS and to benefit themselves and Protecnium.

260.    Defendants Ramirez and Cortijo were primarily acting as agents for Defendant Protecnium when they interfered in the aforementioned ways.

261.    These actions by Defendants Ramirez, Cortijo and Protecnium were in complete disregard of LTS's contract and business expectancy with HRCP.

262.    These actions by Defendants Ramirez, Cortijo and Protecnium induced defendants HRCP, Dragados, Vinci, Flatiron, and DCB to change their contract offers to LTS, to breach their contract with LTS, and ultimately destroyed LTS's business expectancy.

263.    These actions by Defendants Ramirez, Cortijo and Protecnium were improper because they include fraudulent misrepresentations, misuse of inside or confidential information, and breach of the fiduciary relationship.

264.    In the absence of Defendants' tortious interference, Plaintiff LTS would have been awarded the value of its September 2021 final bid: a thirty (30) month contract for four (4) Senior Party Surveyors at a rate of Eighteen-Thousand-Nine-Hundred-Eighty-Eight Dollars ($18,988) per-surveyor per-month.  The total value of this contract would have been Two-Million-Two-Hundred-Seventy-Eight-Thousand-Five-Hundred-Sixty Dollars ($2,278,560).

265.    Instead, and as a result of Defendants' tortious interference, HRCP only paid Plaintiff LTS a grand total of total of One-Hundred-Seventy-Thousand-Eight-Hundred-Ninety-Two Dollars ($170,892).

266.    Thus, LTS suffered actual damages in the amount of Two-Million-One-Hundred-Seven-Thousand-Six-Hundred-Sixty-Eight Dollars ($2,107,668).

267.    In the alternative, Defendants' tortious interference has caused Plaintiff LTS to suffer damages in the amount of Four-Hundred-Fifty-Five-Thousand-and-Seven-Hundred-Twelve

Dollars ($455,712) - that is, the full value of the twelve-month extension offered to LTS. This contract, and more, was awarded to Protecnium as a result of the tortious interference.

268.    Defendants' tortious interference was willful and wanton and therefore justifies an award of punitive damages.

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants Ramirez and Protecnium, jointly and severally, in the amount of Two-Million-One-Hundred-Seven-Thousand-Six-Hundred-Sixty-Eight Dollars ($2,107,668), plus punitive damages in the amount of Three-Hundred-and-Fifty-Thousand-Dollars ($350,000), plus reasonable attorney fees and costs, and such other and further relief this Court may deem just and proper.

**COUNT VIII – Statutory Business Conspiracy under Va. Code §§ 18.2-499 *et seq*.**
**Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium, Ramirez, Cortijo, Garcia**

269.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

270.    Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium, Ramirez, Cortijo, and Garcia conspired to willfully and maliciously injure Plaintiff LTS in its reputation, business or trade by fraudulent misrepresentation and misappropriation of LTS's trade secrets and methods, which they have used and will use for their own benefit and to LTS's detriment.

271.    Defendants Ramirez and Cortijo, acting on behalf of Protecnium, manipulated the data provided to LTS for its work on the Project. They did this in an attempt to sabotage LTS and to cause injury to LTS's business reputation and to damage the ongoing contract between LTS and HRCP, Dragados, Vinci, Flatiron, and DCB.

272.    Defendants Ramirez, Garcia, Cortijo, and Protecnium conspired to use LTS as a metaphorical stalking horse to allow these Defendants to profit from LTS's institutional

knowledge, expertise, and trade secrets, and sought to position themselves to take the survey contract that LTS demonstrated to them how to perform.

273.    Defendants HRCP, Dragados, Vinci, Flatiron, and DCB knowingly and intentionally allowed Ramirez, Garcia, Cortijo, and Protecnium to sabotage LTS's efforts, to steal their trade secrets, and allowed Ramirez to rig the bidding in favor of Protecnium.  These defendants knew, or should have known, what Ramirez and Protecnium were doing and they intentionally did nothing to stop it.

274.    As a result of Defendants' conspiracy to injure LTS, Plaintiff LTS suffered damages of stolen trade secrets, opportunity cost of not bidding on projects it believed it would be unavailable for, loss of the value of its contracts, and injury to its business reputation in the amount of Three-Million Dollars ($3,000,000).

275.    Plaintiff LTS is entitled to treble damages, as well as reasonable attorney's fees and costs, under Va. Code § 18.2-500.

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium, Ramirez, Cortijo, and Garcia, jointly and severally, in the amount of Nine-Million Dollars ($9,000,000), plus reasonable attorney fees and costs, and such other and further relief this Court may deem just and proper.

### COUNT IX – Common Law Conspiracy
**Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium, Ramirez, Cortijo, Garcia**

276.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

277.    Defendants Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium, Ramirez, Cortijo, and Garcia combined to accomplish by concerted action an unlawful purpose – namely, the obtaining of LTS's trade secrets and the interfering with its contracts and business

expectancy through the aforementioned fraudulent misrepresentations about the bidding procedure, the false representations as to the affiliation of the surveyors on site, misappropriation of trade secrets, false promises that LTS's contract would be expanded and extended, and other malfeasance.

278.    These tortious acts proximately caused Plaintiff LTS's injuries.

279.    As a result of Defendants' conspiracy to injure LTS, Plaintiff LTS suffered damages of stolen trade secrets, opportunity cost of not bidding on projects it believed it would be unavailable for, loss of the value of its contracts, and injury to its business reputation in the amount of Three-Million Dollars ($3,000,000).

280.    Defendants' tortious acts were malicious, willful and wanton and therefore justify an award of punitive damages.

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Ramirez, Cortijo, and Garcia, jointly and severally, in the amount of Three-Million Dollars ($3,000,000), plus Three-Hundred Fifty Thousand Dollars ($350,000.00) in punitive damages, plus reasonable attorney fees and costs, and such other and further relief this Court may deem just and proper.

### COUNT X – Misappropriation of Trade Secrets -- Virginia Uniform Trade Secrets Act Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium, Ramirez, Garcia, Cortijo

281.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

282.    The information, techniques and methods conveyed by Jason Heck to Ramirez, Garcia, and Cortijo of Protecnium constitute trade secrets under the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336 *et seq*, because they derive independent value from not being

generally known to or readily ascertainable by LTS's competitors, and because LTS has made reasonable efforts to maintain their secrecy.

283. Indeed, much of the value offered by LTS to its contracting partners comes from these trade secrets, which it has developed over years of trial and error and through its years of experience surveying complicated construction projects.

284. The trade secrets conveyed are also part of a textbook and trade school that Heck and LTS are developing, and for which they will charge money.

285. Jason Heck conveyed these trade secrets to Defendants after Defendants, expressly and impliedly, assured him that these information, techniques and methods would be used to complete the Project and not to harm LTS's interests, and after Defendants told Heck that LTS's contract would be extended and expanded at the end of the year.

286. Defendants Protecnium, Ramirez, Garcia, and Cortijo have misappropriated, and continue to misappropriate, these trade secrets, which were disclosed by Jason Heck and LTS to these defendants under the false belief that they were being disclosed solely to LTS's contract partners for use solely on the Project, and not that they were being disclosed to LTS's competitors and would be used to harm LTS's interests by said competitors.

287. Defendants HRCP, Dragados, Vinci, Flatiron, and DCB have misappropriated, and continue to misappropriate, these trade secrets because they, through their agent Ramirez, made misrepresentations to Jason Heck and LTS that induced them to disclose the trade secrets under false pretenses to LTSs competitor Protecnium, and because they continue to employ these trade secrets to this day themselves and through their continued contracts with Protecnium.

288. Defendants' misappropriation of trade secrets has caused Plaintiff LTS to suffer actual damages in the amount of One-Million-Four-Hundred-Fifty-Five-Thousand-Seven-

Hundred-Twelve Dollars ($1,455,712) - that is, the value to LTS of the trade secrets misappropriated, plus the full value of the twelve-month contract extension, which was awarded to Protecnium as a result of the misappropriation.

289.    Defendants have been unjustly enriched in the amount of One-Million Dollars ($1,000,000).

290.    Defendants' misrepresentations are willful and malicious and justify an award of punitive damages.

291.    LTS is entitled to injunctive relief under Virginia Code § 59.1-337.

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants HRCP, Dragados, Flatiron, Vinci, DCB, Protecnium, Ramirez, Garcia, and Cortijo, jointly and severally, in the amount of One-Million-Four-Hundred-Fifty-Five-Thousand-Seven-Hundred-Twelve Dollars ($1,455,712), plus punitive damages in the amount of Three-Hundred-and-Fifty-Thousand-Dollars ($350,000), plus reasonable attorney fees and costs.  In addition, Plaintiff LTS respectfully requests that this Court provide injunctive relief enjoining Defendants from using any of the trade secrets misappropriated except upon reasonable royalty paid to LTS. Finally, Plaintiff LTS respectfully requests such other further relief as this Court may deem just and proper.

### COUNT XI – Unjust Enrichment
**Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium, Ramirez, Garcia, Cortijo**

292.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

293.    LTS conferred a benefit on Defendants by divulging its trade secrets, which LTS had developed and learned through its years of experience surveying complicated bridge projects.

294.    The trade secrets conveyed are also part of a textbook and trade school that Heck and LTS are developing, and for which they will charge money.

295.    Defendants knew of the benefit – indeed, Ramirez specifically asked Jason Heck of LTS to teach the other surveyors on site, including Garcia and Cortijo of Protecnium, how to properly survey the complicated bridge work on the Project.

296.    Defendants should have reasonably expected to pay LTS for the value of the benefits conferred.

297.    Defendants have retained these benefits, continue to use the methods and secrets conferred on the basis of their fraudulent misrepresentations, and have not paid LTS for their value. Indeed, Defendants cut LTS out of the Project after misappropriating the trade secrets in order to retain these benefits without paying for them.

298.    By    misappropriating    LTS's    trade    secrets    through    their    fraudulent misrepresentations and by breaching their fiduciary duties to LTS, Defendants have been unjustly enriched at the expense of LTS in the amount of One-Million Dollars ($1,000,000).

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants HRCP, Dragados, Flatiron, Vinci, DCB, Protecnium, Ramirez, Garcia, and Cortijo, jointly and severally, in the amount of One-Million Dollars ($1,000,000), plus reasonable attorney fees and costs, and respectfully requests such other further relief as this Court may deem just and proper.

## COUNT XII – Sherman Antitrust Act
### Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium, and Ramirez

299.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

300.    The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States[.]" *See* 15 U.S.C. § 1.

301.    The contracts, combination, and/or conspiracy between HRCP, Dragados, Vinci, Flatiron, and DCB on the one hand and Protecnium and Ramirez on the other constitutes an unreasonable restraint of trade or commerce under the Sherman Act.

302.    The false representations and fraud committed by Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium and Ramirez subverted the free market, undermined the bidding process, misappropriated LTS's trade secrets, and rigged the bidding for Protecnium to the injury of LTS.

303.    Defendants HRCP, Dragados, Vinci, Flatiron, and DCB, through their agent Ramirez, conspired to falsely represent to Jason Heck of LTS that LTS's contract would be extended and expanded at the end of the year, thereby convincing Heck to divulge trade secrets to surveyors like Ramirez, Cortijo and Garcia who, unbeknownst to Heck, worked for Protecnium, LTS's competitor.

304.    Once Heck had taught the Protecnium surveyors how to properly do the work, Defendants conspired to "shop" LTS's bid to Protecnium, which calibrated its bids to come in at just under the price that LTS had offered.  This "bid shopping" occurred in violation of the Prime Contract requirement that Good Industry Practice be employed, in breach of established industry standards and practice, and contrary to Defendants' express and implied representations to LTS that the bidding would be sealed and confidential through SmartBid.

305.    The goal of the conspiracy was to steal LTS's trade secrets, pass them off to LTS's competitor Protecnium, and to hire Protecnium at just under LTS's price, all at LTS's expense.

306.    Defendants' "bid-rigging" and "bid shopping" was an unreasonable restraint of trade under the Sherman Act.

307.    Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium and Ramirez knew of the conspiracy and willingly engaged in it.

308.    This conspiracy substantially affected interstate commerce, because these contracts involve the construction of interstate roadways and involve payments of public funds originating in part from the federal government.

309.    In the absence of Defendants' unlawful contracts, combinations, and/or conspiracies in restraint of trade, Plaintiff LTS would have been awarded the value of its September 2021 final bid: a thirty (30) month contract for four (4) Senior Party Surveyors at a rate of Eighteen-Thousand-Nine-Hundred-Eighty-Eight Dollars ($18,988) per-surveyor per-month. The total value of this contract would have been Two-Million-Two-Hundred-Seventy-Eight-Thousand-Five-Hundred-Sixty Dollars ($2,278,560).

310.    Instead, and as a result of Defendants' unlawful bid rigging, bid shopping, contracts and conspiracies in restraint of trade, Plaintiff LTS was only paid a grand total of total of One-Hundred-Seventy-Thousand-Eight-Hundred-Ninety-Two Dollars ($170,892).

311.    Thus, LTS suffered actual damages in the amount of Two-Million-One-Hundred-Seven-Thousand-Six-Hundred-Sixty-Eight Dollars ($2,107,668).

312.    The Clayton Act allows persons injured under the Sherman Act to sue in district court for treble their damages, attorney's fees and costs. *See* 15 U.S.C. § 15(a).

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants HRCP, Dragados, Flatiron, Vinci, DCB, Protecnium, and Ramirez, jointly and severally, in the amount of Six-Million-Three-Hundred-Twenty-Three-Thousand-Four Dollars

($6,323,004), plus reasonable attorney fees and costs, and respectfully requests such other further relief as this Court may deem just and proper.

### COUNT XIII - Virginia Antitrust Act, Va. Code §§ 59.1-9.1 *et seq.*
### Defendants HRCP, Dragados, Vinci, Flatiron, DCB, Protecnium, and Ramirez

313.    Plaintiff fully incorporates by reference the foregoing paragraphs as if fully stated herein.

314.    For the same reasons that Defendants' conduct violates the Sherman Act, it also violates the Virginia Antitrust Act, Va. Code §§ 59.1-9.1 *et seq.*

315.    Plaintiff LTS's damages are the same under the Virginia Antitrust Act as under the Sherman Act.

316.    The Virginia Antitrust Act also allows a Plaintiff to sue for treble damages. *See* Va. Code § 59.1-9.12(b).

WHEREFORE Plaintiff LTS respectfully prays that judgment be entered against Defendants HRCP, Dragados, Flatiron, Vinci, DCB, Protecnium, and Ramirez, jointly and severally, in the amount of Six-Million-Three-Hundred-Twenty-Three-Thousand-Four Dollars ($6,323,004), plus reasonable attorney fees and costs, and respectfully requests such other further relief as this Court may deem just and proper.

Respectfully submitted,
LAND TO SAND SITE SERVICES, INC.


_____/s/_____
Benjamin E. Ader, Esq. VSB # 92072
TATE BYWATER
2740 Chain Bridge Rd.
Vienna, Virginia 22181
T: 703-938-5100
F: 703-991-0605
E: bader@tatebywater.com
*Counsel for Plaintiff*